# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| SPORTSMAN'S GUIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   09-cv-1152 |
| | ) | |
| HAVANA NATIONAL BANK, | ) | |
| SCHMEILSKI OUTDOORS, INC., ALL | ) | |
| ABOUT GAME, INC., and ADVANCED | ) | |
| GAME TECHNOLOGY GLOBAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on cross-motions for summary judgment by Defendants Havana National Bank ("Havana") and Schmeilski Outdoors ("Schmeilski"). (Docs. 38 & 39). Both Motions are fully briefed and ready for disposition. For the reasons stated below, Havana's Motion for Summary Judgment is denied, and Schmeilski's Motion for Summary Judgment is granted.

Plaintiff filed a Complaint for Interpleader pursuant to Federal Rule of Civil Procedure 22 on April 30, 2009. (Doc. 1). Plaintiff alleged that it had purchased products (the "Disputed Product") from Schmeilski over which Havana claimed a perfected security interest. Plaintiff acknowledged that it owed payment for the products, but was reluctant to pay Schmeilski because of Havana's claimed security interest. It filed this interpleader action in order to prevent multiple litigation and double payment liability. (Doc. 1 at 2-4). Plaintiff moved for leave to deposit the payment (the "disputed fund") with the Court, and, after some dispute regarding

the correct amount, was granted leave to do so. (Doc. 23). Plaintiff deposited $173,084.00 with the Court, and was granted $13,026.50 in attorneys' fees, which were deducted from the disputed fund. (Doc. 28). Plaintiff was granted an injunction to prevent Defendants from attempting to pursue other actions arising out of this transaction, and is no longer a party to this suit. (Doc. 23).

Following the deposit of the disputed fund, Defendants Havana and Schmeilski entered discovery on the issue of their rights to the remainder of the fund.[1] They each filed their instant Motions for Summary Judgment on December 5, 2011, asserting their claim to the disputed fund.

## LEGAL STANDARD

"On cross-motions for summary judgment, the same standard of review in Federal Rule of Civil Procedure 56 applies to each movant." *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir.2005). The United States Court of Appeals for the Seventh Circuit has explained that courts "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 540, 643 (7th Cir.2007) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997)).

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

---

[1]     Havana and Schmeilski are the only Defendants to have appeared in this suit. Defendants All About Game and Advanced Game Technology Global were both served in May 2009 (Docs. 5 & 6), but have not appeared, and so have waived any claim of entitlement to payment from the disputed fund. Schmeilski asserts that these two corporations are no longer in existence. (M. Nelan Dep. at 7).

issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the Court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The Court draws only reasonable inferences. *Id.*

Once the movant has met its burden of showing the Court that there are no genuine issues of material fact, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Havana is a national bank with its principal office in Havana, Illinois. Havana's president is Jeff Bonnett, and Carrie Shaw is a vice-president and loan officer. At all relevant times, Defendant All About Game, Inc. ("AAG") and Defendant Advanced Game Technology Global, Inc. ("AGT") were manufacturers and wholesalers of sporting, hunting, and outdoor goods; they were Illinois corporations 95% owned by Mark Nelan. Susan Hayes was a 1-2% owner of AAG and AGT, and worked for them as a liaison between the companies and Havana for the purposes of orders, shipping, and payment information. Schmeilski is a retailer of outdoor sporting and hunting goods, is an Illinois corporation, and is 50% owned by Wes Schmeilski. Jeff Cole is a business associate of Mr. Schmeilski's, who traveled with him to China in 2008. Jim Cole II is another business associate of Mr. Schmeilski's. Both Jeff and Jim Cole were involved and familiar with the financing and purchase of the Disputed Product from ZZLP by Schmeilski. Plaintiff is a Minnesota corporation, a commercial retailer of goods and services.

Around June 2005, Havana entered into a business lending relationship with AAG and AGT. As part of this relationship, Havana financed the Chinese manufacture of hunting related products for the companies; these products were shipped to retailers in the United States. Once the products were manufactured and inspected by AAG's and AGT's representative in China, Havana would wire the funds for the products to the factory at the direction of Ms. Hayes, and the products

---

[2] Unless otherwise noted, these facts are drawn from the parties' statements of undisputed facts. Immaterial facts are excluded unless necessary for clarity. Where a material fact is genuinely disputed by the parties, the Court notes that dispute.

were shipped. Havana filed financing statements concerning the specific purchase order numbers as given by the United States retailers. Between 2005 and 2008, Havana loaned AAG and AGT approximately $4,000,000 to $4,500,000.

In early 2008, AAG and AGT entered into a contract with Zhejiang Zhongu Leisure Products, Ltd. ("ZZLP") wherein ZZLP agreed to manufacture AAG- and AGT-branded products and goods for the 2008 selling season.[3] AAG and AGT maintained the same financing arrangement with Havana as they had had since 2005. In 2008, AAG and AGT presented 105 purchase orders for production by ZZLP to Havana, which represented $2,800,000 in goods. In the spring of 2008, and in May 2008, Mr. Nelan informed Havana that ZZLP required a total of $750,000 in prepayment in order to begin production. Mr. Bonnett of Havana created a document the parties refer to as the "Repayment Plan," which set out the plan for AAG and AGT to repay Havana; it lists individual purchase orders, by number, from AAG's and AGT's customers and payment made by Havana on those purchase orders. Havana filed financing statements concerning its security agreements with AAG and AGT; these financing statements specifically list retailers' purchase order numbers and stock certificates, as well as

> All inventory equipment, accounts, chattel paper, instruments, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance,

---

[3] Havana asserts that the products made by ZZLP for AAG and AGT were made specifically for those companies. Schmeilski asserts that this is immaterial, and that Havana has failed to put on competent evidence of ZZLP's actual practices. The Court agrees, given the legal discussion below, that it is immaterial to the issue of whether Havana had a security interest in the Disputed Product that AAG's and AGT's products were unique. Even accepting that the Disputed Product was originally made for AAG and AGT, Havana cannot prove, as a matter of law, that it has a security interest in the Disputed Product.

and general intangibles; whether any of the foregoing is owned now or acquired later; all accessions[,] additions, replacements, and substitutions relating to any of the foregoing; all proceeds and insurance proceeds relating to the foregoing whether now owned or hereafter acquired.

(Doc. 38, Ex. D).

On April 1 and April 8 of 2008, Havana sent out $300,000 in wire transfers at Ms. Hayes' direction, and sent another $450,000 total in wire transfers on May 30 and June 9, 2008 at Ms. Hayes' direction. Ms. Shaw processed these wire transfer requests and other documentation associated with them. These wire transfers were directed to several different account numbers, including one associated with Ningbo Electric and Consumer Goods Import and Export Group, to which a wire transfer had also been made in December 2007.

The parties dispute the meaning of the wire transfers by Havana, totaling $807,056.64. Havana, relying on the deposition of Mr. Nelan and documentary evidence of the wire transfers authenticated by Ms. Shaw, asserts that AAG wired money to ZZLP to fund the purchase of the Disputed Product. Schmeilski, on the other hand, asserts that Havana cannot prove that ZZLP actually received the money, or that the money was intended to cover the production and manufacture of the specific Disputed Product, as Mr. Nelan lacks the personal knowledge necessary to testify to the wire transfers.[4] In addition, Schmeilski asserts that the

---

[4] In asserting that the wire transfers were not made for the purpose of purchasing raw materials for the Disputed Products, Schmeilski relies on Mr. Bonnett's deposition testimony that Mr. Nelan informed Havana that the purpose of the first payment was to "prime the pump" as a prepayment, and that he later informed Havana that ZZLP required an additional payment to fund the purchase of raw materials. (Doc. 44 at 6-7). Conversely, Schmeilski asserts, citing __ Bonnett's deposition, that Mr. Nelan's testimony as to the agreement between

documentary evidence of the wire transfers is not competent to prove that ZZLP actually received the money, as the first three transfers were directed toward three different accounts, one of which directed some of the money toward a company of another name. Finally, Sportsman's argues that none of Havana's evidence[5] links the payments allegedly made by Havana to ZZLP to the specific Disputed Product. This dispute is discussed further below.

Schmeilski's regular practice during this time period was to look for and purchase from manufacturers hunting equipment that had been abandoned or for which payment had not been made. On February 18, 2009, Plaintiff issued a purchase order to Schmeilski for certain goods, which ordered them from ZZLP; Plaintiff received them directly from ZZLP in March 2009. Plaintiff's order had been for $233,030 worth of products, though Plaintiff only received $196,436.30 worth of product. Certain prefixes on the purchase order indicate products manufactured for AAG or AGT, and are the items over which Havana asserts a security interest: AGT-714, AGT-56, AGT-705, AGT-625B, AGT-627, AGT ECB15, and DOA 904. These items constitute the "Disputed Product." When Plaintiff issued this Purchase order, Schmeilski knew that the products had been manufactured for AAG and

himself and ZZLP for AAG to pay ZZLP the remainder of the balance upon payment by AAG's customers is hearsay and should be stricken. Mr. Nelan can testify to the content of an agreement to which he was a party. Setting aside the issue of whether this is hearsay evidence, the Court finds that whether the payment was intended as a prepayment or to purchase raw materials, and how or when AAG planned to pay ZZLP for the remainder of the balance, is immaterial, given the discussion below. The important issue is whether the money was intended to pay ZZLP for the specific Disputed Product, which is discussed further below.

[5]     This evidence includes the Repayment Plan, discussed above, the letter from Mr. Sorenson to Sportsman's informing Sportsman's of the claimed security interest, and the Security Agreements.

AGT. The Court has reviewed the financing statements filed by Havana that have been submitted as evidence, and finds that none of them contain any reference to these particular item numbers; they instead list purchase order numbers. (Doc. 38, Ex. D).

The parties dispute Schmeilski's knowledge concerning the status of the Disputed Product and Havana's potential interest in it when Schmeilski purchased the Disputed Product from ZZLP. Mr. Schmeilski testified that, while he knew the Disputed Product had been originally manufactured for AAG and AGT, he had assumed that the Disputed Product had not been paid for, and that AAG and AGT were perhaps in bankruptcy or otherwise non-functioning. Jeff Cole testified that someone at ZZLP had informed him that the product had not been paid for. However, Havana puts on evidence that Mr. Schmeilski and Mr. Cole were both informed at a December 2008 meeting that ZZLP had failed to deliver an order of product, both Mr. Schmeilski and Mr. Cole denied having been so informed. It also asserts that, prior to the end of 2008, Mr. Schmeilski, Jeff Cole, and Jim Cole met with Mr. Nelan, who informed them of Havana's financing relationship with AAG and ATG; Mr. Schmeilski and both Jeff and Jim Cole denied having been so informed or receiving any information related to this topic.

On March 23, 2009, Havana claimed a security interest in the Disputed Product received by Plaintiff. When it was informed of the claimed security interest, Plaintiff opened the shipping containers and took inventory of the items received.

As noted above, Plaintiff deposited $173,084 with the Court, and the parties agree that this is the appropriate value of the Disputed Product.[6]

<h3 align="center">DISCUSSION</h3>

This suit turns on whether Havana's purported security interest in the Disputed Product, as "inventory" of AAG and AGT, entitles it to the proceeds of the Disputed Product, as opposed to Schmeilski's claim to the money as a result of its sale of the Disputed Product to Sportsman's. The suit turns on whether Havana had a perfected security interest in the Disputed Product. The burden of proving the existence of a perfected security interest is on the party asserting that interest, which is Havana in this case. *In re Standard Foundry Products, Inc.*, 206 B.R. 475, 478 (Bkrtcy. N.D. Ill. 1997). There are two types of security interests that are potentially at issue in this suit: an ordinary security interest in goods, and a "purchase money security interest." Both are governed by the Article 9 of the Uniform Commercial Code, which Illinois has adopted. In addition to asserting that it holds a security interest, Havana also claims that Schmeilski is not a "buyer in ordinary course" entitled to take free of the security interest.

## I.    Ordinary Security Interest

In order to show the existence of a security interest, "(1) the collateral must be in the possession of the secured party or the debtor must sign a security agreement which describes the collateral; (2) value must be given; and (3) the debtor must have rights in the collateral." *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 649 N.E.2d 511, 515-16 (Ill. App. Ct. 1995) (citing 810 ILCS 5/9-

---

[6]    This is less than the $196,436.30 in product received by Plaintiff, as Havana did not claim any security interest in a portion of the products received.

203(1), (2) (West 1993)). Perfection of a security interest is accomplished by properly filing a financing statement.

Havana's argument is that it made a loan to AAG, secured by AAG and AGT's inventory and proceeds of it; AAG and AGT executed security agreements covering, *inter alia*, their "inventory" and the proceeds thereof. These security agreements listed certain purchase order numbers in describing the property secured thereunder. AAG and AGT then ordered products from ZZLP for which Havana made substantial pre-payment to the Chinese manufacturer ZZLP. Havana asserts that these products, upon manufacture, constituted "inventory" of AAG and AGT, and were thus part of the collateral. Havana filed financing statements noting the specific purchase order numbers, as well as claiming an interest in all of AAG's and ATG's inventory and the proceeds thereof. Schmeilski later purchased the Disputed Product from ZZLP, and sold them to Sportsman's; Havana argues that the money Sportsman's owed for the Disputed Product constitutes "proceeds" of the "inventory."

Schmeilski asserts that Havana's claim is faulty for several reasons: (1) Havana cannot prove that AAG and AGT actually made payment to ZZLP for the Disputed Product such that they would have "rights in the collateral," (2) Havana cannot prove that the funds were actually used to purchase raw materials to make the Disputed Product,[7] (3) AAG and AGT never had possession of the Disputed Product, and so it was not "inventory," (4) it did not know of Havana's claimed

---

[7]    Whether the payments actually reached ZZLP and were actually directed toward the purchase of the Disputed Product are more thoroughly discussed below, in the context of a potential purchase money security interest.

security interest, and (5) Schmeilski's purchase of the Disputed Product was "in the ordinary course." The Court herein finds that the Disputed Product did not constitute AAG's and AGT's "inventory" and they did not otherwise have "rights in the collateral" when they entered into the security agreement with Havana, because they did not at any time possess the Disputed Product. Because this determination disposes of the claimed security interest in inventory, there is no need to discuss the parties' other arguments.

The most significant disagreement on this issue turns on whether AAG and AGT had "rights in the collateral" when they created the security interest with Havana. Havana's claim is based on its argument that AAG and AGT paid ZZLP to begin manufacturing the Disputed Product; it asserts that the products thus became AAG's and AGT's "inventory." Schmeilski attempts to undercut this claim by arguing that Havana's evidence of payments to ZZLP is insufficient because Havana cannot show that ZZLP actually received the money, and by arguing that because AAG and AGT never possessed the Disputed Product, they did not have "rights in the collateral." These argument overlap somewhat with the requirement that the security agreement describe the collateral, in that in order for the goods to be included in the term "inventory," AAG and AGT must have had possession of them. The Court therefore considers the two issues concurrently.

The question is whether making prepayments to a manufacturer is alone sufficient to create "rights in the collateral" in goods or to render them "inventory,"

without the debtor ever taking actual or constructive possession of the goods.[8] The case cited on this point by Havana is inapposite. *Central Nat. Bank of Mattoon v. Worden-Martin, Inc.* involved a "credit sale" where the seller transferred possession of a car to a buyer with an agreement to be paid later, and this was held to be sufficient to create "rights in the collateral" in the buyer. 413 N.E.2d 539 (Ill. App. Ct. 1980). This case does not apply here, though, because here there was no transfer of possession; indeed, even Havana's paraphrase of the holding reads "rights in the car passed to the [buyer]...when the seller delivered *possession* upon promise of latter payment." (Doc. 38 at 10 (citing *Central Nat. Bank*, 413 N.E. 2d at 541) (emphasis added)). *Central National Bank* is clearly unhelpful to Havana, as there was no transfer of possession to AAG and ATG in this case.[9] Indeed, the situation here, according to Havana, is the reverse: AAG and AGT made payments, with promise of later possession. The issue is whether AAG's and AGT's payments were sufficient to create "rights in the collateral" or to make the goods their "inventory."

Havana also makes unsupported assertions that "[t]itle to the Disputed Product rested at all times with AAG and AGT...and ZZLP was not the 'seller.'" (Doc. 38 at 10). The Court cannot simply take these assertions as true, as even under Havana's version of events, ZZLP manufactured the items and sold them to AAG and ATG in order to allow AAG and ATG to fulfill their customers' orders. Even if the sale was arranged prior to the products' manufacture, ZZLP still "sold" the products to AAG and ATG. Whether AAG and AGT held title or other sufficient

---

[8]    Constructive possession, as discussed further below, could exist where the debtor had exercised its right to have the product delivered to its customer.

"rights in the collateral" is a legal question that Havana's argument does not address.

Schmeilski argues that, because AAG and AGT never had "possession" of the Disputed Product, they did not have sufficient "rights in the collateral" to create a security interest; in addition, their lack of possession undermines the assertion that the Disputed Product was part of their "inventory," which goes to the requirement that the security agreement describe the collateral. In support of this claim, Schmeilski cites, without analysis, to 810 ILCS 5/9-102(a)(48), which defines "inventory," a law review article, and two cases. Under § 5/9-102(a)(48), "inventory" is defined as goods that:

> (A) are leased by a person as lessor;
> (B) are held by a person for sale or lease or to be furnished under a contract of service;
> (C) are furnished by a person under a contract of service; or
> (D) consist of raw materials, work in process, or materials used or consumed in a business.

It would appear that the Disputed Product (raw materials and/or work in process of ZZLP, and/or goods for sale made and held by ZZLP) is best categorized under either subsection (B) or (D). There is no explicit requirement of possession by the debtor in the statute. The law review article opines that the better rule is to require possession in order for a debtor to have "rights in the collateral" as inventory, but notes contrary opinion. Ralph C. Anzivino, *When Does a Debtor Have Rights in the Collateral Under Article 9 of the Uniform Commercial Code?*, 61 MARQ. L. REV. 23, 44-52 (1977).[10] Finally, Havana is correct in noting that Schmeilski's two case

---

[10] As pointed out by the author of the law review article, the very definition of the term "inventory" seems to require actual possession, as it requires that the

citations are not dispositive of the question, as both debtors there took possession of the collateral, but Havana offers nothing of substance to show that possession is not required.

> In *Midwest Decks, Inc.*, the Illinois appellate court noted that
>
> The [UCC] does not define the term "rights in the collateral", but it is generally recognized that rights in the collateral may be sufficient if: [1] the debtor has possession and title to the goods; [2] the true owner consents to the debtor's use of the collateral as security; or [3] if the true owner is estopped from denying the creation of the security interest because "he has allowed another to appear as the owner, or as having full power of disposition over the property, so that an innocent person is led into dealing with such apparent owner."

649 N.E.2d at 516 (quoting *In re Pubs, Inc. of Champaign*, 618 F.2d 432, 437-38 (7th Cir. 1980); citing *Central National Bank*, 413 N.E.2d at 541-42); *In re S.M. Acquisition Co.*, 03 CV 7072, 2004 WL 1151575 (N.D. Ill. Apr. 29, 2004) (discussing *Midwest Decks*' description of test and noting lack of Illinois authority stating other means of acquiring "rights in the collateral"). Here, there is no allegation or evidence that ZZLP consented to AAG and ATG using the disputed property as security, or that ZZLP engaged in any conduct that would lead an outsider to believe that AAG and ATG were the owners. As it is Havana's burden to show that it has a perfected security interest, it is Havana's burden to show such at least a genuine issue of material fact as to such conduct by ZZLP, which it has not done. In addition, it is undisputed that neither AAG nor ATG ever took possession of the Disputed Product from ZZLP, and so the Court cannot find that AAG or ATG ever

---

goods be "held," "used or consumed." Anzivino, 61 MARQ. L. REV. at 51 (citing U.C.C. § 9-109(4)). *See also* 810 ILCS 5/9-102(a)(48)(B), (D).

had "rights in the collateral" sufficient to create a security interest in the Disputed Product.

In *In re S.M. Acquisition Co.*, the Northern District of Illinois, relying on the first Midwest Decks category, found that actual physical possession may not be required where there is "constructive possession." 2004 WL 1151575, *3 fn. 6 (citing *Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.*, 805 F.Supp. 133 (W.D.N.Y.1992); BLACK'S LAW DICTIONARY 1163 (6th ed. 1990)). There are several important distinctions between the *S.M. Acquisition* court's analysis of "possession," and this case, though. First, the District Court was relying on the bankruptcy court's factual finding that the debtor had "complete control" over the goods in question and so constructively possessed them. Moreover, the goods in question were a set of molds ordered by the debtor, and shipped by the manufacturer directly to Matrix, a company that tested and repaired molds before their use by the debtor. Matrix, which was also a bankruptcy creditor of the debtor, argued that the debtor never possessed the molds (because Matrix held them), and so could not grant a security interest in them to a bank. The bankruptcy court determined that the debtor had complete control because it could decide where the molds were to be shipped and how they would be used; the manufacturer did not retain any control over them. Indeed, the manufacturer had already given up possession of the goods when it shipped them, at the debtor's instruction, to Matrix. Here, on the other hand, ZZLP never shipped the Disputed Product to AAG, AGT, their customers, or any party designated by AAG or AGT, and the undisputed facts clearly show that

AAG and AGT did not exercise the level of control over the Disputed Product as did the *S.M. Acquisition* debtor.

Finally, the case relied on by the district court in *S.M. Acquisition* for the proposition that actual possession was not required, *Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.*, involved the delivery of goods to a "foreign trade zone" by the seller, not a situation in which the seller never delivered or attempted to deliver the goods to the buyer/debtor. 805 F.Supp. at 142. The Western District of New York thoroughly analyzed the issue of whether actual possession is required in order to obtain "rights in the collateral." The only reason the buyer/debtor did not take actual possession of the goods was that he did not pay the required duty; the seller completed its part of the transfer. *Id.* The buyer then had absolute control over the disposition of the goods, and the seller was out of the picture. In this case, again, the goods were never relinquished by ZZLP to AAG or ATG, and so cannot be considered part of their "inventory." *See id.* at 143 (citing *Chartered Bank of London v. Chrysler Corp.*, 171 Cal.Rptr. 748 (Cal.Ct. App. 1981)) (seller's intent to relinquish is key). Even if "constructive possession" is sufficient for a debtor/buyer to have "rights in the collateral" in Illinois, it is still limited to situations in which the seller has given up its control over the goods.[11]

---

[11] The Court notes that typically AAG's and AGT's representative in China would inspect the goods prior to Havana making payment and the goods' shipment. Here, Havana has put on no evidence that ZZLP submitted the products to AAG's and AGT's representative for inspection, which could have supported the argument for "constructive possession" under these authorities.

Havana has failed to put on sufficient evidence to show that it can carry its burden of proving that it has a security interest in the Disputed Product, and so summary judgment cannot be granted in its favor on this issue.

## II.  Purchase money security interest

Though neither party uses the term or discusses the applicable law, both appear to allude to a "purchase money security interest," in that they both address whether the money Havana lent to AAG was actually sent to ZZLP to purchase the Disputed Product, or actually used by ZZLP to purchase raw materials to manufacture the Disputed Product. While they raise this in terms of whether Havana had "rights in the collateral," as discussed above, the Court cannot simply ignore that these facts also point to a potential "purchase money security interest." As relevant to this case, a "purchase money security interest" ("PMSI") is created where the secured party gives value to a debtor "to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." 810 ILCS 5/9-103(a), (b). For non-consumer goods, as in this case, the PMSI must be perfected by filing a financing statement describing the collateral. 810 ILCS 5/9-310(a); *Arcadia Upholstering, Inc. v. 165 Restaurant, Inc.*, 516 N.E.2d 523, 525 (Ill. App. Ct. 1987). The burden of proof is on the party asserting the security interest. 810 ILCS 5/9-103(g).

The security agreements Havana cites include a paragraph headed "Purchase Money Security Interest," providing that "[i]f the Property includes items purchased with the Secured Debts, the Property purchased with the Secured Debts will remain subject to [Havana's] security interest until the Secured Debts are paid in full."

(Doc. 38, Ex. C). Moreover, Havana filed financing statements concerning these security agreements, relating to property identified by purchase orders, which were ordered from ZZLP. The real conflict on this issue is whether the money loaned by Havana for the purchase of the disputed property was "in fact so used" to purchase the Disputed Product so as to create a PMSI.

Schmeilski first argues that Havana cannot prove that the wire transfers purportedly sent to ZZLP as payment for the Disputed Product were actually sent to and received by ZZLP.[12] As explained above, Havana put on evidence, in the form of Ms. Shaw's deposition testimony, that it made several wire transfers at the direction of Ms. Hayes in April and May 2008. Schmeilski notes that these transfers were directed toward three different account numbers, and that the second payment was made to Ningbo Electric and Consumer Goods, an entity to which Ms. Hayes had directed payment in December 2007, prior to Mr. Nelan's supposed change to ZZLP, which fact Schmeilski claims indicates that at least one of the payments did not go to ZZLP.[13] Havana counters by pointing to Mr. Nelan's testimony that the

---

[12] Schmeilski includes this argument in the section of its Motion for Summary Judgment addressing whether AAG and AGT had "rights in the collateral," but it is only relevant to the question of whether a PMSI existed. An ordinary security interest does not require that the secured loan was used to purchase the collateral. Schmeilski also disputes whether the funds were intended to "prime the pump" or to actually purchase raw materials. The Court views the distinction between these two terms, whatever minimal distinction there may be, as immaterial. The issue is whether the funds were directed toward ZZLP in order to purchase the Disputed Product from ZZLP – it does not matter what ZZLP itself did with the money, whether it simply pocketed it, or directed it toward specific raw materials.

[13] Schmeilski makes several oblique references to "red flags" concerning Mr. Nelan, apparently trying to insinuate that he was, at least, a less-than-credible witness, or, possibly, that he acted wrongfully in connection with the wire transfers (perhaps, the Court guesses, by causing the funds to be wired to accounts he

wire transfers went to ZZLP for the Disputed Product and the transfer records showing the recipient to have been ZZLP; they correctly point out that the variety of account numbers proves nothing, as a company is allowed to have more than one bank account. The Court finds that there is no genuine dispute as to whether Havana made the wire transfers in question to ZZLP.

Schmeilski also asserts that, because the purchase order numbers contained in the Repayment Plan created by Mr. Bonnet of Havana do not match the Product Identification Numbers on the Disputed Product, Havana cannot prove that its funds were actually used for the purchase of the Disputed Product.[14] The Court rejects the argument that the purchase order numbers must match the Product Identification Numbers. As Havana points out, there is no foundation for Schmeilski's assumption that these numbers should match. Purchase orders often pertain to more than one product, and so there is nothing implying that a purchase order number must necessarily match the relevant product numbers.

However, there needs to be some link in the record between the Disputed *Product* itself and Havana's payment, and that link is missing. Havana claims a security interest in the Disputed Product, which is identified by the Product

---

controlled). The Court is uncertain what Schmeilski intends the import of these implications to be, but reminds Schmeilski that summary judgment is not the place for credibility determinations by the Court, whether implicit or overt. Schmeilski itself notes that such "red flags" "are not relevant to the issues before this Court." (Doc. 39 at 17). Where Mr. Nelan or Ms. Hayes offered competent testimony, the Court will consider it as it would any other testimony.

[14] Though neither party specifically explains this, the Repayment Plan appears to be Havana's record of funds wired to ZZLP, and notes particular purchase order numbers, dates, and dollar figures. It appears to be Havana's only evidence specifically linking the specific wire transfers to specific purchase orders.

Identification Numbers AGT714, AGT56, AGT705, AGT625B, AGT627, AGTECB15, and DOA904. If Havana has no evidence that its funds were actually used to purchase the Disputed Product, it cannot claim a PMSI in that Disputed Product.[15] The Repayment Plan, which does appear to indicate, when read along with the deposition testimony concerning it, that Havana made payments to ZZLP for certain *purchase orders*, specifically lists purchase order numbers, not product numbers, and the security agreement and financing statement list purchase order numbers, not product numbers. The only evidence concerning the product numbers of the Disputed Product is Mr. Nelan's testimony that they were AAG and AGT products; Schmeilski does not dispute that these were products originally manufactured for AAG and AGT. The fact that they were originally manufactured for AAG and AGT, though, does not show that the funds from Havana were actually used to purchase those particular products. In addition, the fact that Havana wired funds to ZZLP for other purchase orders and other goods is insufficient to create a PMSI in the Disputed Product. The key point is that there is no evidence that the Purchase Orders for which Havana wired funds to ZZLP concerned the specific Disputed Product at issue. Havana's evidence only indicates that it paid ZZLP for certain purchase order numbers, not that it paid ZZLP for the specific Disputed

---

[15] The point also supports the conclusion that Havana had no security interest in the Disputed Product as part of AAG's and AGT's inventory, as there is no proof that AAG and/or AGT caused any payment to be made to ZZLP for the specific Disputed Product, further undermining the claim that they had "rights in the collateral."

Havana asks the Court to assume that, because ZZLP produced the products, it must have received payment for them. While this may be a reasonable inference, it does not show that *Havana* actually made the payment to ZZLP, and Havana bears the burden of showing that *it* actually made payment for the specific Disputed Product in order to prove a PMSI.

Product. Therefore, Havana cannot carry its burden of showing that it has a PMSI in the Disputed Product.

## IV.    Knowledge

Whether a third-party buyer knew of a security interest is relevant to the application of 810 ILCS 5/9-317(b), which provides that "a buyer, other than a secured party, of...goods...takes free of a security interest...if the buyer gives value and receives delivery of the collateral without knowledge of the security interest...and before it is perfected." Havana asserts that, even if its security interest was unperfected, Schmeilski cannot benefit from § 5/9-317(b) because it knew of the purported security interest. The parties offer conflicting testimony concerning what Schmeilski had actual knowledge about the status of the Disputed Product when it purchased the product from ZZLP, indicating the existence of a genuine dispute of material fact on this question.[16] This is a genuine dispute of fact, but it is not material, as Havana cannot prove that it has any security interest in the Disputed Product in the first place. A security interest must exist, or "attach," before § 5/9-317(b) applies. As discussed above, there Havana had no security interest in the Disputed Product, either as inventory or a PMSI, and so it has no priority over Schmeilski, even if Schmeilski knew of the security interest when purchasing the Disputed Product from ZZLP.

Where neither party has a security interest, priority must go to Schmeilski, as it gave value for the Disputed Product from ZZLP and had it shipped to Sportsman's. Havana cannot prove that its debtor, AAG and AGT, held the

---

[16]    The existence of this dispute appears to be conceded by Schmeilski. (Doc. 44 at 16).

Disputed Product as inventory (as discussed above in context of a security interest), or that it gave value for the specific Disputed Product (as discussed above in context of a PMSI). Therefore, Havana has no claim to the Disputed Product.

As noted above, Havana does put on some evidence, and makes some argument, that Schmeilski knew that the products it purchased from ZZLP were originally manufactured for AAG and AGT, and that Schmeilski knew that Havana financed AAG's and AGT's business; Havana writes that "Schmeilski put its head in the sand." (Doc. 38 at 12). This appears to be an appeal to equity. However, Havana cites no law suggesting that, absent the existence of a security interest in the Disputed Product, equity or any other consideration should lead the Court to rule in its favor, even if Schmeilski did have the knowledge it claims.[17] Since Havana cannot prove that it has a security interest in the Disputed Product, it cannot take priority over Schmeilski, and summary judgment must be granted in Schmeilski's favor.

## CONCLUSION

For the foregoing reasons, Havana's Motion for Summary Judgment (Doc. 38) is DENIED, and Schmeilski's Motion for Summary Judgment (Doc. 39) is GRANTED. Schmeilski is AWARDED the remainder of the Disputed Fund

---

[17] Indeed, neither alleged piece of knowledge proves that Schmeilski acted inappropriately: (1) even if Schmeilski had been told that there was an unshipped order, there is no evidence that it knew that the Disputed Product was part of that unshipped order, especially given Mr. Cole's testimony that a ZZLP employee had said that the products hadn't been paid for; and (2) even if Schmeilski knew that Havana had security interests in other products made by ZZLP for AAG and AGT, such knowledge does not mean that Schmeilski knew Havana claimed a security interest in the specific Disputed Product. There is no evidence that Schmeilski was ever given the product numbers or a description of the Disputed Product; indeed, even the financing statements fail to include this specific information.

deposited with the Court by Plaintiff, which is $159,673.46. The Clerk is DIRECTED to enter judgment to this effect. Schmeilski SHALL file a notice with the Court within 14 days of the date of this Order indicating the address to which the funds should be directed.

CASE TERMINATED.


Entered this 24th day of July, 2012.


_____
s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge